IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-517

Filed 6 February 2024

Mitchell County, No. 19CRS050502

STATE OF NORTH CAROLINA

v.

NICHOLAS RYAN BUCHANAN

Appeal by Defendant from judgment dated 12 August 2022 by Judge Gregory R. Hayes in Mitchell County Superior Court. Heard in the Court of Appeals 10 January 2024.

*Attorney General Joshua H. Stein, by Assistant Attorney General Catherine R. Laney, for the State-Appellee.*

*William D. Spence for Defendant-Appellant.*

COLLINS, Judge.

Defendant Nicholas Buchanan appeals from judgment entered upon a guilty verdict of felony child abuse inflicting serious bodily injury. Defendant argues that the trial court erred by denying his motion to dismiss, plainly erred by failing to instruct the jury on the defense of accident, and erred by denying his requested jury instructions on the lesser-included offenses of felony child abuse inflicting serious physical injury and misdemeanor child abuse. We find no error in part and no plain error in part.

## I.    Background

Defendant was indicted for felony child abuse inflicting serious bodily injury. The matter came on for trial on 9 August 2022. Evidence of the following was presented at trial: Defendant and his wife ("Mother") are the biological parents of Cecilia,[1] who was born on 12 February 2019. Defendant and Mother separated when Cecilia was approximately six months old. Cecilia lived with Mother during the week and with Defendant during the weekend.

Mother dropped Cecilia off at Defendant's residence for the weekend on 25 October 2019. On 26 October 2019, at approximately 1:30 p.m., Defendant brought Cecilia to Blue Ridge Regional Hospital in Spruce Pine with a head injury. Cecilia was immediately transferred by ambulance to Mission Children's Hospital in Asheville due to the severity of her injury. Upon her admission to the hospital, the doctors determined that Cecilia had sustained a large subdural hemorrhage, meaning that there was a "large amount of blood inside her brain"; significant cerebral edema, meaning brain swelling; and widespread infarction, meaning that "portions of her brain . . . were so swollen that blood was prevented from going to those portions of her brain, and so those portions of her brain had become necrotic or died." Cecilia underwent an emergency craniotomy; the neurosurgeon drilled holes into her skull

---

[1] We use a pseudonym to protect the identity of the minor child.

and removed part of her scalp to drain the blood around her brain and allow the swelling to occur without further damaging her brain.

## A. Defendant's Narrative and Testimony

Defendant was interviewed by the Department of Social Services ("DSS") at the hospital and gave the following explanation for Cecilia's injuries: Defendant put Cecilia to bed at 9:00 p.m. Cecilia woke up at 1:30 a.m. and Defendant fed her a bottle. Defendant went to put her in the Pack 'n Play where she usually slept, but "he fell because he had lost a significant amount of weight and his pants fell down, so they kind of tripped him and he fell forward." Cecilia's head hit the Pack 'n Play first, and then she fell to the ground. Defendant told DSS that Cecilia vomited after she fell, "but that she always spits up, so he just figured he would put her to sleep and she was fine." Cecilia woke up at approximately 9:30 a.m. and Defendant fed her a bottle, "but she seemed lethargic, like she wasn't crawling, she wasn't trying to sit up, and that's when he became more alarmed." Defendant made "a couple of different statements" as to why he did not seek medical attention sooner. Defendant told DSS that he did not have gas in his car, that he had a flat tire, and that he did not have a car seat and he did not think ambulances had car seats.

Defendant testified at trial to the following: Defendant put Cecilia to bed between 9:00 p.m. and 10:00 p.m. on 25 October 2019. Cecilia woke up at approximately 1:00 a.m. and Defendant fed her a bottle and changed her diaper. After Cecilia fell back asleep in Defendant's arms, he stood up to put her in the

Pack 'n Play where she usually slept. Defendant took "maybe one or two steps, then [his] pants fell off and [he] tripped and fell with [Cecilia]." As a result of Defendant's fall, Cecilia hit the back of her head on the bar of the Pack 'n Play and fell to the ground. Defendant picked Cecilia up and "she was like a little stunned, I guess you would say, but she wasn't crying super hard. She wasn't puking." Cecilia had "like a tiny little knot on the back of her head, like the lower bulb of the head."

Defendant called Mother four times, but she did not answer the phone. Defendant then texted, "[Mother], something is wrong with [Cecilia], answer the phone." When Mother did not reply, he re-sent the text. Defendant called Mother a fifth time approximately twenty seconds later, and Mother answered the phone. Defendant and Mother exchanged a series of phone calls over the next hour and ultimately decided not to take Cecilia to the hospital because Defendant told Mother "she was fine[.]" At approximately 1:45 a.m., Defendant sent Mother a picture of Cecilia "reaching out for [Defendant]" accompanied by a text stating, "I sat her down and she did this so I think we're okay." Defendant kept Cecilia awake for "maybe two, two-and-a-half hours" to "make sure that she didn't lose consciousness or anything else."

Cecilia woke up around 7:30 a.m. Defendant texted Mother that Cecilia was "fine" and sent a photo of her holding a bottle. Shortly before 11:00 a.m., Cecilia started "getting really fussy" and "wouldn't eat hardly[.]" Cecilia then "went limp, intense limp, projectile vomited, and that's when [Defendant] knew something was

really bad wrong. And [Defendant] noticed one of her eyes was real tiny and one was huge." Defendant called his mother between 11:00 a.m. and 12:30 p.m. and asked her to take Cecilia and him to the hospital. Defendant testified that he did not seek medical attention sooner because he did not have gas in his car, he had a flat tire, he did not have a car seat, "there might have been . . . something mechanical wrong with the car[,]" and Cecilia "didn't have any symptoms up until I called my mom to come get me and her."

## B. Dr. Monahan-Estes' Report and Testimony

Dr. Sarah Monahan-Estes, a child abuse pediatrician at Mission Children's Hospital, examined Cecilia after her surgery and submitted a written report. The report stated, in relevant part, as follows: Cecilia was "referred by the PICU for concerns of physical abuse." Defendant stated that "[Cecilia] fell out of his arms and hit the back of her head on the bar of the pack-n-play." Defendant further stated that Cecilia "went limp then tense, limp then tense" and she "may have" thrown up one time. Defendant told Dr. Monahan-Estes that "he didn't have a car seat so he couldn't drive [Cecilia] to the hospital" and that "he didn't think ambulances had infant car seats so he didn't call 911." Dr. Monahan-Estes' report noted that "[t]here was significant delay in seeking medical care by both parents as the father was in communication with the mother from the time the incident reportedly happened." Dr. Monahan-Estes ultimately concluded in her report that "[t]he injury seen on

examination is not consistent with the history provided, as such there is concern for physical abuse."

At trial, Dr. Monahan-Estes testified to the following: Cecilia's largest injuries were intracranial. Cecilia had a very large subdural hemorrhage, meaning that "there was this large amount of blood inside her brain, and that blood and a series of other things [were] causing swelling in her brain"; significant cerebral edema, meaning brain swelling; and areas of infarction, meaning that "there were portions of her brain that were so swollen that blood was prevented from going to those portions of her brain, and so those portions of her brain had become necrotic or died." Cecilia also had infraspinatus ligamentous injuries, meaning that "the ligaments in between her spine were damaged." Consequently, Dr. Monahan-Estes was "concerned that her neck was injured from moving too far forward or back." Furthermore, Cecilia had bilateral confluent retinal hemorrhages, meaning that there was "bleeding on the inside of both of her eyes, all the way through both all of the layers of her eyes."

Because Cecilia "had significantly more and significantly more severe injuries than would be expected from a short fall, from falling from the father's arms into a Pack 'N Play, or even onto the floor[,]" Dr. Monahan-Estes concluded in her report that "there is concern for physical abuse."

**C. Cecilia's Post-Surgery Condition**

Cecilia was intubated and completely sedated for one week following the surgery. Because Cecilia was in severe condition, an intracranial pressure monitor was placed in her head to "monitor the level of pressure that her brain is under." After Cecilia regained consciousness, she suffered approximately twelve seizures and at least two periods of blindness while she was in the hospital. Cecilia was transferred to Levine's Children's Hospital in Charlotte on 25 November 2019 for specialized rehabilitation. Cecilia underwent another surgery on 12 December 2019 to replace the part of her scalp that was previously removed. On 16 December 2019, after fifty-one days of hospitalization, Cecilia was discharged from the hospital and moved into her adoptive mother's home for continued rehabilitation.

Cecilia suffered permanent brain damage to the right side of her brain, thereby severely restricting her mobility on the left side of her body. Due to the pressure and swelling in her brain, Cecilia's optical nerve was damaged, and her eyesight is permanently impaired. Just prior to trial, Cecilia underwent two additional surgeries: on 28 May 2020, Cecilia underwent a surgery to repair the bone flap on her head that had started to dissolve, and on 20 June 2022, Cecilia underwent a surgery to remove screws in her skull that were beginning to protrude through her skin.

The jury returned a guilty verdict of felony child abuse inflicting serious bodily injury. The trial court sentenced Defendant to 157 to 201 months of imprisonment. Defendant appealed.

## II. Discussion

### A. Motion to Dismiss

Defendant first argues that the trial court erred by denying his motion to dismiss because the State failed to produce substantial evidence that he intentionally inflicted serious bodily injury to Cecilia.

We review a trial court's denial of a motion to dismiss de novo. *State v. Chavis*, 278 N.C. App. 482, 485, 863 S.E.2d 225, 228 (2021). "In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 549 (2018) (quotation marks and citations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Rivera*, 216 N.C. App. 566, 568, 716 S.E.2d 859, 860 (2011) (quotation marks and citation omitted).

"In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *Chekanow*, 370 N.C. at 492, 809 S.E.2d at 549-50 (quotation marks and citation omitted). Any contradictions or discrepancies in the evidence are for the jury to decide. *State v. Wynn*, 276 N.C. App. 411, 416, 856 S.E.2d 919, 923 (2021).

Under North Carolina law,

> [a] parent . . . of a child less than 16 years of age who intentionally inflicts any serious bodily injury to the child or who intentionally commits an assault upon the child which results in any serious bodily injury to the child, or which results in permanent or protracted loss or impairment of any mental or emotional function of the child, is guilty of a Class B2 felony.

N.C. Gen. Stat. § 14-318.4(a3) (2023). "Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred." *State v. Liberato*, 156 N.C. App. 182, 186, 576 S.E.2d 118, 120 (2003). "In determining the presence or absence of intent, the jury may consider the acts and conduct of the defendant and the general circumstances existing at the time of the alleged commission of the offense charged." *Id.* (citation omitted). "[W]hen an adult has exclusive custody of a child for a period of time during which the child suffers injuries that are neither self-inflicted nor accidental, there is sufficient evidence to create an inference that the adult intentionally inflicted those injuries." *Id.* at 186, 576 S.E.2d at 120-21 (citations omitted).

Here, Cecilia's medical reports indicate that she sustained a large subdural hemorrhage, meaning that there was a "large amount of blood inside her brain"; significant cerebral edema, meaning brain swelling; and widespread infarction, meaning that "portions of her brain . . . were so swollen that blood was prevented from going to those portions of her brain, and so those portions of her brain had become necrotic or died." Defendant told Dr. Monahan-Estes at the hospital that "he

was walking to put [Cecilia] back to sleep [and] his pants fell off around his ankles and he tripped falling with [Cecilia,]" and that "[Cecilia] fell out of his arms and hit the back of her head on the bar of the pack-n-play." However, Dr. Monahan-Estes testified that the injuries Cecilia sustained were inconsistent with Defendant's narrative "[b]ecause she had significantly more and significantly more severe injuries than would be expected from a short fall, from falling from the father's arms into a Pack 'N Play, or even onto the floor." Dr. Monahan-Estes testified that

> accidental injuries happen every day, all the time. Anyone who has children or grandchildren or friends or knows anybody or has tried to walk down a sidewalk, we all trip, we all fall. Accidental injuries occur all the time, and we have expected injuries that occur when those accidents happen. So when you have short falls, parents fall all of the time and bump their kids' heads on things or drop their babies. We all know this occurs. But the injury that [Cecilia] had was so much more severe than what would have ever been expected from falling and hitting her head, even if she hit her head really hard on the bar of the Pack 'N Play.

Dr. Monahan-Estes testified that "there was no accidental history provided to [her] that was consistent with the injuries seen on exam" and that the injuries Cecilia sustained were consistent with physical abuse. Cecilia's medical reports and Dr. Monahan-Estes' testimony constitute substantial evidence to support a conclusion that Defendant intentionally inflicted serious bodily injury to Cecilia. *See id.* (holding that the trial court did not err by denying defendant's motion to dismiss where two expert witnesses testified that the injuries sustained by the victim were intentionally

inflicted, and that "the amount of force required to cause such injuries was greater than that resulting from [the victim] falling off either a mattress or a chair, which was the explanation given by defendant").

Accordingly, the trial court did not err by denying Defendant's motion to dismiss.

**B. Jury Instruction on the Defense of Accident**

Defendant next argues that the trial court plainly erred by failing to instruct the jury on the defense of accident. Defendant did not request a jury instruction on the defense of accident,[2] nor did he object to its omission; we thus review only for plain error.

"For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citation omitted). "To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Id.* (quotation marks and citations omitted). "Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings[.]" *Id.* (quotation marks, brackets, and citations omitted).

---

[2] Defendant's only mention of the word accident during the charge conference was related to his argument that the trial court should instruct the jury on misdemeanor child abuse.

"It is the duty of the trial court to instruct the jury on all substantial features of a case raised by the evidence." *State v. Hamilton*, 262 N.C. App. 650, 660, 822 S.E.2d 548, 555 (2018) (quotation marks and citation omitted). "This is a duty which arises notwithstanding the absence of a request by one of the parties for a particular instruction." *State v. Loftin*, 322 N.C. 375, 381, 368 S.E.2d 613, 617 (1988) (citations omitted). "All defenses arising from the evidence presented during the trial constitute substantive features of a case and therefore warrant the trial court's instruction thereon." *Id.* (citations omitted).

The pattern jury instruction for the defense of accident in non-homicide cases states:

> When evidence has been offered that tends to show that the alleged assault was accidental and you find that the injury was in fact accidental, the defendant would not be guilty of any crime even though the defendant's acts were responsible for the alleged victim's injury. An injury is accidental if it is unintentional, occurs during the course of lawful conduct, and does not involve culpable negligence. Culpable negligence is such gross negligence or carelessness as imparts a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others. When the defendant asserts that the alleged victim's injury was the result of an accident the defendant is, in effect, denying the existence of those facts which the state must prove beyond a reasonable doubt in order to convict the defendant. The burden is on the state to prove those essential facts and in so doing disprove the defendant's assertion of accidental injury. The State must satisfy you beyond a reasonable doubt that the alleged victim's injury was not accidental before you may return a verdict of guilty.

N.C.P.I.—Crim. 307.11 (footnote omitted).

Even assuming arguendo that the trial court erred by not instructing the jury on the defense of accident, Defendant has failed to establish prejudice. The trial court instructed the jury, in relevant part, in accordance with the pattern jury instructions on felony child abuse inflicting serious bodily injury, the definition of intent, and the State having the burden to prove every element of the charged offense beyond a reasonable doubt. N.C.P.I.—Crim. 239.57 (felonious child abuse inflicting serious bodily injury); N.C.P.I.—Crim. 120.10 (definition of intent); N.C.P.I.—Crim. 101.10 (burden of proof and reasonable doubt). The jury instructions, when viewed together, directed the jury that it could only find Defendant guilty of felony child abuse inflicting serious bodily injury if it found beyond a reasonable doubt that Defendant "intentionally inflicted a serious bodily injury to [Cecilia] or intentionally assaulted [Cecilia] which proximately resulted in serious bodily injury to [Cecilia], or intentionally assaulted [Cecilia], which proximately resulted in permanent or protracted loss or impairment of any mental or emotional function of [Cecilia]."

The jury heard Defendant's testimony that "[his] pants fell off and [he] tripped and fell with [Cecilia]," resulting in her hitting the back of her head on the bar of the Pack 'n Play and falling to the ground. However, the jury also heard testimony from Dr. Monahan-Estes that Cecilia "had significantly more and significantly more severe injuries than would be expected from a short fall, from falling from the father's arms into a Pack 'N Play, or even onto the floor." The jury thus found beyond a reasonable

doubt that Defendant's testimony was not credible by finding him guilty of felony child abuse inflicting serious bodily injury.  In light of the instructions provided to the jury and the testimony offered at trial, Defendant has failed to show that the trial court's failure to instruct the jury on the defense of accident "seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings[.]"  *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334 (quotation marks, brackets, and citations omitted).

Accordingly, the trial court did not plainly err by not instructing the jury on the defense of accident.

## C. Jury Instruction on Lesser-Included Offenses

Defendant argues that the trial court erred by denying his requested jury instructions on the lesser-included offenses of felony child abuse inflicting serious physical injury and misdemeanor child abuse.

We review challenges to the trial court's decisions regarding jury instructions de novo.  *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009).

"An instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater."  *State v. Millsaps*, 356 N.C. 556, 561, 572 S.E.2d 767, 771 (2002) (citations omitted).  "It is well settled that a defendant is entitled to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternative verdicts."  *Id.* at 562, 572 S.E.2d at 772 (quotation marks and citation omitted).  "On the other hand, the trial court need not submit lesser included degrees

of a crime to the jury when the State's evidence is positive as to each and every element of the crime charged and there is no conflicting evidence relating to any element of the charged crime." *Id.* (quotation marks, emphasis, and citations omitted). "If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense . . . and there is no evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of the lesser-included offense." *State v. Brichikov*, 383 N.C. 543, 554, 881 S.E.2d 103, 112 (2022) (quotation marks, emphasis, brackets, and citations omitted).

The distinguishing element at issue here between felony child abuse inflicting serious bodily injury, felony child abuse inflicting serious physical injury, and misdemeanor child abuse is the level of harm inflicted upon the child. The crux of Defendant's argument is that the trial court's refusal to instruct the jury on the lesser-included offenses "deprived the jury of an option to determine the baby's injuries were not as severe as the State's expert child abuse pediatrician testified/reported[.]"

Felony child abuse inflicting serious bodily injury requires a showing of serious bodily injury, which is defined as "[b]odily injury that creates a substantial risk of death or that causes serious permanent disfigurement, coma, a permanent or protracted condition that causes extreme pain, or permanent or protracted loss or impairment of the function of any bodily member or organ, or that results in

prolonged hospitalization." N.C. Gen. Stat. § 14-318.4(d)(1) (2023). Felony child abuse inflicting serious physical injury requires a showing of serious physical injury, which is defined as "[p]hysical injury that causes great pain and suffering[,]" including mental injury. *Id.* § 14-318.4(d)(2) (2023). Misdemeanor child abuse requires a showing of physical injury, which "includes cuts, scrapes, bruises, or other physical injury which does not constitute serious injury." *See id.* § 14-34.7(c) (2023).[3]

Here, there was no evidence presented at trial from which the jury could have rationally found that Defendant committed the lesser offense of felony child abuse inflicting serious physical injury or misdemeanor child abuse because the State's evidence is positive as to the element of serious bodily injury and there is no conflicting evidence. Dr. Monahan-Estes testified that Cecilia had a very large subdural hemorrhage; that she had significant cerebral edema; and that her brain had areas of infarction. Cecilia underwent an emergency craniotomy in which the neurosurgeon drilled holes into her skull and removed part of her scalp to drain the blood around her brain and allow the swelling to occur without further damaging her brain. Cecilia was intubated and completely sedated for one week following the surgery. After Cecilia regained consciousness, she suffered approximately twelve seizures and at least two periods of blindness while she was in the hospital.

---

[3] Physical injury is not defined in N.C. Gen. Stat. § 14-318.2. However, the pattern jury instruction for misdemeanor child abuse cites N.C. Gen. Stat. § 14-34.7(c), which defines physical injury for certain assaults on law enforcement personnel. *See* N.C.P.I.—Crim. 239.60.

Cecilia was transferred to Levine's Children's Hospital in Charlotte on 25 November 2019 for specialized rehabilitation. Cecilia underwent another surgery on 12 December 2019 to replace the part of her scalp that was previously removed. On 16 December 2019, after fifty-one days of hospitalization, Cecilia was discharged from the hospital and moved into her adoptive mother's home for continued rehabilitation.

Cecilia suffered permanent brain damage to the right side of her brain, thereby severely restricting her mobility on the left side of her body. Due to the pressure and swelling in her brain, Cecilia's optical nerve was damaged, and her eyesight is permanently impaired. On 28 May 2020, Cecilia had a third surgery to repair the bone flap on her head that had started to dissolve. Cecilia had a fourth surgery on 20 June 2022 to remove screws in her skull that were beginning to protrude through her skin. This evidence fully satisfies the State's burden of proving that Defendant intentionally inflicted serious bodily injury to Cecilia. *See Brichikov*, 383 N.C. at 554, 881 S.E.2d at 112.

Accordingly, the trial court did not err by denying Defendant's requested jury instructions on the lesser-included offenses of felony child abuse inflicting serious physical injury and misdemeanor child abuse.

### III.  Conclusion

For the foregoing reasons, we find no error in part and no plain error in part.

NO ERROR IN PART; NO PLAIN ERROR IN PART.

Judges HAMPSON and THOMPSON concur.